HOOD, D.J., delivered the opinion of the court, in which COLE, J., joined. BATCHELDER, J. (pp. 495-508), delivered a separate dissenting opinion.
OPINION
HOOD, District Judge.
Defendant, a judge in the General Division of the Court of Common Pleas in Richland County, Ohio, appeals the district court’s order granting Plaintiffs motion for partial summary judgment and denying summary judgment for Defendant on the issue of whether his courtroom display of the Ten Commandments violated the Establishment Clause of the First Amendment. For the reasons set forth below, we AFFIRM the decision of the district court.
I. BACKGROUND
In July 2000, James DeWeese, the elected judge of the General Division of the Court of Common Pleas in Richland County, Ohio, hung a poster of the Ten Commandments in a gilded frame on the wall of his courtroom, Courtroom Number One. The poster hung on a side wall of the courtroom, near the front of the audience section. Directly opposite and across the gallery from the poster of the Ten Commandments, he hung a similarly styled and framed poster of the Bill of Rights.
DeWeese had created both of these posters on his computer and had them enlarged and framed at a local framing store, all at his personal expense. The style of the posters is identical. At the top, in the largest size print on the page, are the words “the rule of law.” Next, in smaller-sized and all-capital typeface, one poster bears the words “THE TEN COMMANDMENTS.” In identical typeface, the other poster bears the words “BILL OF RIGHTS.” Finally, each poster contains the text of the relevant documents.[1] No captions or plaques accompany these *488 posters to describe or explain their purpose or to tie either of the posters together into a unified display with one another or any other items displayed in the courtroom or in the vicinity of the courtroom.
Also in the courtroom are three posters featuring portraits of and quotations from Thomas Jefferson, James Madison, and Alexander Hamilton concerning the virtues of the jury trial system. The posters were hung on the rear wall of the courtroom in 1993. Above the jury box hangs a portrait of Abraham Lincoln already present in the courtroom when DeWeese came onto the bench in 1991. On the front wall hangs the seal and the motto of the State of Ohio, “With God All Things Are Possible.” These items were placed in the courtroom in 1991 or 1992.
DeWeese’s courtroom is located on the third floor of the Richland County Courthouse and shares a lobby area with the three other courtrooms located on that floor. On the third floor, there are also several elevators, stairwells, offices,' and restrooms. There are two displays in the lobby area. The first, the “Freedom Shrine,” is a display of twenty-nine reproductions of historical documents arranged and donated by the National Exchange Club. The historical documents include the Mayflower Compact, presidential inaugural speeches, and the text of the “Star Spangled Banner,” and were chosen to memorialize the founding of the country and subsequent moments of historical import. The display was hung sometime in the 1980s. There is also a separate poster containing the portraits of nine historical figures and quotations regarding the history of the jury system.
Plaintiff-Appellee American Civil Liberties Union of Ohio Foundation, Inc. (“ACLU-Ohio”), brought this action on behalf of members in Richland County, Ohio, against DeWeese and the Commissioners of Richland County, Ohio, all in their official capacities.[2] ACLU-Ohio asserted that the hanging and continued display of the Ten Commandments violated the Establishment Clause of the First Amendment to the United States Constitution and Article I, § 7, of the Ohio Constitution. ACLU-Ohio requested a permanent injunction and order directing removal of the Ten Commandments poster. The district court granted ACLU-Ohio’s motion for partial summary judgment against DeW-eese, denied Defendants’ cross-motion for summary judgment, and ordered DeWeese to remove the poster immediately. This appeal followed.
II. STANDARD OF REVIEW
We review district court orders granting summary judgment de novo. Black v. Roadway Express, Inc., 297 F.3d 445, 448 (6th Cir.2002). More to the point, it is taught that:
... in reviewing a district court’s grant of a permanent injunction, we review the district court’s conclusions of law and its findings of constitutional, or ultimate, facts de novo. See Grutter v. Bollinger, 288 F.3d 732, 743 (6th Cir.2002). We review the district court’s findings of subsidiary facts for clear error. Deja Vu v. Metro. Gov’t of Nashville, 274 F.3d 377, 389 (6th Cir.2001).
Adland v. Russ, 307 F.3d 471, 477 (6th Cir.2002).
III. DISCUSSION
A. STANDING
Standing to sue requires an individual to demonstrate (1) actual or threat *489 ened injury which is (2) fairly traceable to the challenged action and (3) a substantial likelihood the relief requested will redress or prevent the plaintiffs injury. Adland, 307 F.3d at 477-78. A voluntary membership organization has standing to sue on behalf of its members “when (a) its members otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization’s purpose; and (c) neither the claim asserted nor the relief requested requires participation of individual members in the lawsuit.” Hunt v. Washington State Apple Adver. Comm., 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977); Adland, 307 F.3d at 478. Thus, in Adland, the court found standing where individual plaintiffs frequently traveled to the Kentucky State Capitol to engage in political advocacy for a variety of organizations and would endure direct and unwelcome contact as a result of legislation proposing erection of a proposed Ten Commandments monument there.[3] Adland, 307 F.3d at 478. Standing for their eo-Plain-tiff, the American Civil Liberties Union, a voluntary membership organization, followed from their own standing under the test set out above. Id. at 478-79.
ACLU-Ohio has identified member Bernard Davis, a lawyer who travels to and must practice law within DeWeese’s court *490 room from time to time. There, Davis has and would continue to come into direct, unwelcome contact with the Ten Commandments display, the removal of which would, no doubt, prevent further injury to him. The interest protected by this challenge on his behalf is, no doubt, germane to the ACLU-Ohio’s stated purpose, the preservation of the constitutional separation of church and state. The declaratory and injunctive relief and attorneys fees sought in this matter would not require the direct participation of any ACLU-Ohio member. It follows that the ACLU-Ohio has standing to assert the instant challenge to DeWeese’s display.
B. THE LEMON TEST
The Establishment Clause of the First Amendment, made applicable to the states by the Fourteenth Amendment, states that “Congress shall make no law respecting an establishment of religion.” U.S. Const., amend. I; Everson v. Bd. of Educ., 330 U.S. 1, 8, 67 S.Ct. 504, 91 L.Ed. 711 (1947). Thus, “[t]he Establishment Clause ... prohibits government from appearing to take a position on questions of religious beliefs or from ‘making adherence to a religion relevant in any way to a person’s standing in the political community.’” [4] County of Allegheny v. Am. Civil Liberties Union, 492 U.S. 573, 593-94, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989) (quoting Lynch v. Donnelly, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984)), quoted in American Civil Liberties Union of Kentucky v. McCreary County, Kentucky, 354 F.3d 438, 445 (6th Cir.2003). To determine whether a particular action by the government violates the Establishment Clause, we apply the test set forth in Lemon v. Kurtzman, asking (1) whether the challenged government action has secular purpose, (2) whether the action’s primary effect advances or inhibits religion, and (3) whether the action fosters an excessive entanglement with religion.[5] Lemon v. Kurtzman, 403 U.S. 602, 612-13, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971); Adland, 307 F.3d at 479.
1. PURPOSE
“Although a government’s stated purposes for a challenged action are to be given some deference, it remains the task of the reviewing court to ‘distinguish a sham secular purpose from a sincere one.’ ” McCreary County, 354 F.3d at 446 (quoting Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290, 308, 120 S.Ct. 2266, 147 *491 L.Ed.2d 295 (2000)). Thus, a plaintiff must show that the predominate purpose for a challenged display is religious, although a totally secular purpose is not required. Id. (citing Adland, 307 F.3d at 480). At the end of the day, the display must not constitute a “purposeful or surreptitious effort to express some kind of subtle governmental advocacy of a particular religious message.” Id. (quoting Lynch, 465 U.S. at 680, 104 S.Ct. 1355).
“The Ten Commandments are undeniably a sacred text in the Jewish and Christian faiths, and no legislative recitation of a supposed secular purpose can blind us to that fact[ ....,]” but the Supreme Court has established no per se rule that displaying the Ten Commandments in a public setting is unconstitutional. Stone v. Graham, 449 U.S. 39, 41-42, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980); see Edwards v. Aguillard, 482 U.S. 578, 593-94 and 607-08, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987) (Powell, J., concurring). While not holding that all displays or uses of the Ten Commandments evinced a sectarian purpose, the Supreme Court has determined that, as a text:
... the Commandments do not confine themselves to arguably secular matters .... Rather, the first part of the commandments concerns the religious duties of believers: worshiping the Lord God alone, avoiding idolatry, not using the Lord’s name in vain, and observing the Sabbath day.
Id. at 41-42,101 S.Ct. 192.
This is to say that, notwithstanding the contents of the text, it would be possible for a government actor to use the Decalogue in a constitutionally permissible manner where, for example, it is “integrated into the school curriculum, where the Bible may constitutionally be used in an appropriate study of history, civilization, ethics, comparative religion, or the like.” Stone, 449 U.S. at 42, 101 S.Ct. 192. see Aguillard, 482 U.S. at 594, 107 S.Ct. 2573 (u[Stone ] did not mean that no use could ever be made of the Ten Commandments, or that the Ten Commandments played an exclusively religious role in the history of Western Civilization.”). This was not the case in Stone, where the Supreme Court was faced with a Kentucky statute requiring that the Ten Commandments be posted in each classroom with a notation indicating the secular application of the Ten Commandments as it was incorporated into the “fundamental legal code of Western Civilization and the Common Law of the United States.” Stone v. Graham, 449 U.S. 39, 41, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980); see Lynch, 465 U.S. at 679, 104 S.Ct. 1355 (“The Court [in Stone ] carefully pointed out that the Commandments were posted purely as a religious admonition, not integrated into the school curriculum.”).
Accordingly and considering the facts in the instant matter, we agree with the district court that DeWeese has not posted his display with a permissible secular purpose. DeWeese has testified that:
My intent in posting these documents was to use them occasionally in educational efforts when community groups come to the courtroom and ask me to speak to them. These documents are useful in talking about the origins of law and legal philosophy and about the rule of law as opposed to the rule of man.
J.A. at 75. He continued, stating that he chose the Ten Commandments because they were emblematic of moral absolutism and that he chose them to express the belief that law comes either from God or man, and to express his belief that the law of God is the “ultimate authority.” J.A. at 135-37. He explained that in the course of his educational efforts he would point to the Ten Commandments as an example of *492 God as the ultimate authority in law. J.A. at 153.
As a result, the district court noted that DeWeese’s purpose was:
... (1) to instruct individuals that our legal system is based on moral absolutes from divine law handed down by God through the Ten Commandments and (2) to help foster debate between the philosophical position of moral absolutism (as set forth in the Ten Commandments) and moral relativism in order to address what he perceives to be a moral crisis in this country.
American Civil Liberties Union of Ohio Foundation, Inc. v. Ashbrook, 211 F.Supp.2d 873, 888 (N.D.Ohio 2002). The district court concluded that “[a] state actor officially sanctioning a view of moral absolutism in his courtroom by particularly referring to the Ten Commandments espouses an innately religious view and, thus, crosses the line created by the Establishment Clause.” Id. at 889 (emphasis in original).
Despite his stated intent to use the display for educational purposes, DeWeese has not described a role for the Ten Commandments poster in his educational errand other than to admonish participants in talks or programs in his courtroom to look to the Commandments as a source of law. His own testimony belies the secular purpose he wishes to ascribe to it, and, as he acted alone in posting the display, his stated purpose for the display must guide the decision in this matter. Accordingly, we find that the district court properly applied the first prong of the Lemon test and did not misapply the teaching of Stone v. Graham, as Appellant contends. DeW-eese wore his “heart” on his shirt sleeve during his deposition, and the district court properly relied upon his testimony when it determined that DeWeese’s purpose in posting the Ten Commandments revealed a predominate non-secular purpose for the display. The display fails the first prong of the test and constitutes a violation of the Establishment Clause of the First Amendment.
2. ENDORSEMENT
In order to ascertain the primary effect of the action under the second prong of the Lemon test, we apply the “endorsement” test, asking whether or not a reasonable observer would believe that a particular action constitutes an endorsement of religion by the government. Baker v. Adams County/Ohio Valley Sch. Bd., 310 F.3d 927, 929 (6th Cir.2002); Adland, 307 F.3d at 479. We ask whether a reasonable observer “acquainted with the text, ... history, and implementation” of DeWeese’s display of the Ten Commandments in his courtroom would view it as a state endorsement of religion. Santa Fe Indep., Sch. Dist., 530 U.S. at 308, 120 S.Ct. 2266; McCreary County, 354 F.3d at 458. “[T]he inquiry must be viewed under the ‘totality of the circumstances surrounding the display .... [,]’ ” including the contents and the presentation of the display, because the effect of the government’s use of religious symbolism depends on context. McCreary County, 354 F.3d at 458 (quoting Books v. City of Elkhart, Indiana, 235 F.3d 292, 304 (7th Cir.2000)).
In identifying the appropriate context in which to consider a religious symbol, the Supreme Court has rejected expansive notions of context in decisions involving Christmas-time creche displays, demonstrating how the failure to integrate religious symbols with an overall secular theme can result in the endorsement of religion. County of Allegheny, 492 U.S. at 598, 109 S.Ct. 3086. In Allegheny, the Supreme Court determined that secular holiday symbols located elsewhere in the courthouse and at a distance from what it *493 deemed to be an impermissible creche display could not:
... negate the endorsement effect of the creche. The record demonstrates clearly that the creche, with its floral frame, was its own display distinct from any other decorations or exhibitions in the building.
Id. at 598, n. 48, 109 S.Ct. 3086. It refused to equate this creche display with another located in the midst of contemporaneously erected secular holiday symbols.
In determining what constitutes a constitutionally permissible display of the Ten Commandments in a government building, the McCreary County court stated that “the symbols must be interconnected in a manner that is facially apparent to the observer!,] and ... the interconnection must be secular in nature.” McCreary County, 354 F.3d at 459. When secular and non-secular items are displayed together, we consider whether the secular image “detracts from the message of endorsement; [or if] rather, it specifically links religion ... and civil government.” Books, 235 F.3d at 307. In the case of a single religious symbol or document placed alongside symbols of patriotic or political importance, it is understood that:
the reasonable observer will see one religious code placed alongside ... political or patriotic documents, and will understand that the [government actor] pro-motets] that one religious code as being on a par with our nation’s most cherished secular symbols and documents. This is endorsement....
American Civil Liberties Union of Kentucky v. McCreary County, Kentucky, 145 F.Supp.2d 845, 851 (E.D.Ky.2001), quoted in McCreary County, 354 F.3d at 459.
Thus, this Court has condemned transparent attempts to “secularize” displays of the Ten Commandments by surrounding them with other patriotic documents and symbols. McCreary County, 354 F.3d at 460 (citing Indiana Civil Liberties Union v. O’Bannon, 259 F.3d 766, 773 (7th Cir.2001) (holding that a display consisting of Bill of Rights, Preamble to Indiana Constitution and Ten Commandments would signal to reasonable observer that “the state approved of such a link, and was sending a message of endorsement.”)). Similarly, the Seventh Circuit Court of Appeals found in Books that a Ten Commandments monument topped with an American eagle gripping the national colors had the impermissible effect of linking religion and civil government. Books, 235 F.3d at 304, cited in McCreary County, 354 F.3d at 460, and Adland, 307 F.3d at 486-87.
The Ten Commandments display in DeWeese’s courtroom is certainly separate and distinct from the items contained in the Freedom Shrine in the adjacent lobby, notwithstanding his argument that one must pass through that lobby to reach his courtroom. Beyond noting the distance between the items in his courtroom and the items in the lobby, we note that the items in each display were posted at different times, by different parties, and are not even displayed in a similar aesthetic fashion. There has been no attempt, such as the posting of a sign, to create a connection between the two displays for observers. Similarly, the Ten Commandments display is divorced from the other items displayed in DeWeese’s courtroom— the portrait of President Abraham Lincoln, posters extolling the jury system, the Ohio seal, and the Ohio state motto — each postéd at different times, in different portions of the courtroom, by various parties, and without any apparent concern for their connection, aesthetic or otherwise, to the other items displayed. Any argument that DeWeese’s display of the Ten Commandments must be considered in the context of these other items posted in the courthouse *494 is contrived at best. The relative placement of the items simply does not suggest a cohesive display, theme, or secular message that could mitigate any message of endorsement on the part of DeWeese in posting the Ten Commandments in his courtroom.
Accordingly, we are left to consider the Ten Commandments display in context with DeWeese’s Bill of Rights poster, contemporaneously created and placed on display by DeWeese. Demonstrating a unity of typeface, font size, and framing, these two items have been placed opposite one another on otherwise blank walls in DeWeese’s courtroom. Insofar as there is a cohesiveness suggesting a unified display, the Bill of Rights poster does nothing to negate the endorsement effect of the Ten Commandments poster, and the joint display affords Appellant no relief. DeWeese’s display conveys a message of religious endorsement because of the complete lack of any analytical connection between the Ten Commandments and the Bill of Rights that could yield “a unifying historical or cultural theme that is also secular” for a reasonable observer. McCreary County, 354 F.3d at 460. The Bill of Rights is not only a cherished secular document — it is a legal document securing the rights of parties appearing in DeWeese’s courtroom and binding DeW-eese as a jurist. “The Ten Commandments are several thousands of years old, [are] not a product of ... American culture and, many believe, are the word of God.” Id. They bind no jurist and are not “law” in any courtroom, notwithstanding any similarities or historical associations between the Decalogue and our Constitution, the Bill of Rights, statutes, and common law.
Thus, even though the Ten'Commandments poster is posted opposite the Bill of Rights, a “reasonable person will think religion, not history.” Indiana Civil Liberties Union, 259 F.3d at 773 (holding that reasonable observer would not be able to make an analytical connection between Ten Commandments, Bill of Rights and Preamble to Indiana Constitution), cited in McCreary County, 354 F.3d at 460. By placing the Decalogue in apparent equipoise with the Bill of Rights in this manner, DeWeese has created the effect of an endorsement of a particular religious code, vis á vis the Ten Commandments, by the government.[6] Thus, even had Appellant’s non-secular purpose not been announced so clearly in his deposition testimony, we could still find that this particular display of the Ten Commandments constitutes an impermissible government endorsement of religion in violation of the Establishment Clause of the First Amendment. Nonetheless, as a government action “violates the Establishment Clause if it fails to satisfy any of [the Lemon test] prongs,” we limit our holding under the Lemon test to the conclusion that the district court did not err in determining that DeWeese demonstrated a non-secular purpose in posting the Ten Commandments in his courtroom. Aguillard, 482 U.S. at 583, 107 S.Ct. 2573; McCreary County, 354 F.3d at 462 (Gibbons, J., concurring).
C. HISTORICAL PRECEDENT AND CEREMONIAL DEISM
DeWeese proposes that his Ten Commandments poster should not be considered impermissible by virtue of Lemon analysis for it is supported by historical precedent. He suggests that it is similar *495 to a constitutionally permissible invocation recited at the beginning of state legislative sessions, addressed in Marsh v. Chambers as “part of the fabric of our society.” Marsh v. Chambers, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983). While he argues that his poster is nothing more than a similar “tolerable acknowledgment of beliefs widely held among the people of this country his comparison is inappropriate as he has identified no long standing national practice or tradition of posting the Ten Commandments in county courthouses. Id. at 792, 103 S.Ct. 3330.
Finally, DeWeese also relies heavily on the recent decision in ACLU of Ohio v. Capitol Square Review & Advisory Board to suggest that the Decalogue is more or less like the state motto of Ohio, “With God All Things Are Possible” because it does not “purport to compel belief or acquiescence ....[,] command participation in any form of religious exercise ....[,] assert a preference for one religious denomination or sect over others, ... [or] involve the state in the governance of any church.” ACLU of Ohio v. Capitol Square Review & Advisory Board, 243 F.3d 289, 299-300 (6th Cir.2001). The Sixth Circuit determined that:
The motto is merely a broadly worded expression of a religious/philosophical sentiment that happens - to be widely shared by the citizens of Ohio. As such, we believe, the motto fits comfortably within this country’s long and deeply entrenched tradition of civic piety, or “ceremonial deism”...
Id. The same cannot be said of the Ten Commandments. As discussed in Stone, they necessarily serve as an admonishment to an observer because the first part of the commandments “concerns the religious duties of believers: worshiping the Lord God alone, avoiding idolatry, not using the Lord’s name in vain, and observing the Sabbath day.” Stone, 449 U.S. at 41-41, 101 S.Ct. 192. This prescriptive quality is distinct from the type of ceremonial deism described in Capitol Square and cannot redeem this display.
IV. CONCLUSION
For the reasons stated above, we find that Judge DeWeese’s display of the Ten Commandments violates the Establishment Clause of the First Amendment. Accordingly, we AFFIRM the decision of the district court.

.The text of the Ten Commandments hanging in his courtroom reads as follows:
I. Thou shalt have no other gods before me.
II. Thou shalt not make unto thee any graven image. Thou shalt not bow down thyself to them, nor serve them for I the LORD thy God am a jealous God.
III. Thou shalt not take the name of the LORD thy God in vain; for the LORD will not hold him guiltless that taketh his name in vain.
IV. Remember the sabbath day, to keep it holy. Six days thou shalt labor, and do all thy work. But the seventh day is the sabbath of the LORD thy God: in it thou shalt not do any work.
V. Honor thy father and thy mother: that thy days may be long upon the land which the LORD God giveth thee.
VI. Thou shalt not kill.
VII. Thou shalt not commit adultery.
VIII. Thou shalt not steal.
IX. Thou shalt not bear false witness against thy neighbor.
X. Thou shalt not covet thy neighbor’s house, thou shalt not covet thy neighbor’s wife, nor his manservant, nor his maidservant, nor his ox, nor his ass, nor anything that is thy neighbor's.

. The County Commissioners were not the subject of the district court’s order granting Plaintiffs motion for partial summary judgment and denying Defendant DeWeese’s motion for summary judgment and are not parties to this appeal.

. Unlike Judge Batchelder, we do not take the Supreme Court’s decision in Valley Forge Christian College v. Americans United for the Separation of Church and State to stand for the proposition that psychological injury can never be a sufficient basis for the conferral of Article III standing. See Valley Forge Christian College v. Americans United for the Separation of Church and State, 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). In that case, the Supreme Court held that the individuals in whose name the organization brought suit had failed to establish that they had actually been injured by the Department of Education’s decision to transfer some of its surplus land to a private, Christian college, operating under the auspices of the Assemblies of God Church. Although the Supreme Court explicitly stated that injuries that merely amount to "the psychological consequence presumably produced by observation of conduct with which one disagrees” are insufficient to confer standing under Article III, we believe that this statement cannot be read without taking the particular circumstances of that case into account. In fact, the Supreme Court’s decision that the Valley Forge plaintiffs lacked standing because its members had suffered no direct injury was based, in large part, on the fact that although the property transfer occurred in Chester County, Pennsylvania, while the named plaintiffs resided in Maryland and Virginia and "learned of the transfer through a news release.” Id. at 487, 102 S.Ct. 752.
Accordingly, this circuit and other circuits have read Valley Forge’s language as depending in no small part on the directness of the harm alleged. Thus, in Washegesic v. Bloomingdale Public Schools, the court held that a former student had standing to challenge a school’s hanging of a picture of Jesus in the school’s hallway. Washegesic v. Bloomingdale Public Schools, 33 F.3d 679, 682-83 (6th Cir.1994). There, the court found that the matter was distinguishable from Valley Forge because of the plaintiff's "continuing direct contact with the object at issue.” In Adland v. Russ, the court conferred standing on a group of plaintiffs who challenged the placement of a Ten Commandments monument on the capitol grounds. Adland v. Russ, 307 F.3d 471 (6th Cir.2002). The court found that the fact that the plaintiffs "frequently travelled] to the State Capitol to engage in political advocacy for a variety of organizations and that they will endure direct and unwelcome contact with the Ten Commandments monument,” was sufficient to meet the "injury-in-fact” requirement for standing. Id. at 478. Contrary to what the dissent deems to be a mis-reading of the Valley Forge precedent, this circuit’s elaboration of Valley Forge is consistent with both the principles established therein, and with the articulations of our sister circuits. See Murray v. Austin, 947 F.2d 147, 151 (5th Cir.1991); ACLU v. City of St. Charles, 794 F.2d 265, 268 (7th Cir.1986); American Civil Liberties Union of Georgia v. Rabun County, 698 F.2d 1098, 1108 (11th Cir.1983).

. There is a "crucial difference between government speech endorsing religion, which the Establishment Clause forbids, and private speech endorsing religion, which the Free Speech and Free Exercise Clauses protect.” Santa Fe Independent School Dist. v. Doe, 530 U.S. 290, 302, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000) (quoting Board of Educ. of Westside Community Schools v. Mergens, 496 U.S. 226, 250, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990) (O'Connor, J., concurring) (emphasis in original)). DeWeese's posters are situated in a courtroom, a public space, and were placed on the wall by a sitting judge charged with the decoration of that space while in office and presiding in the same courtroom. As such, we reject Judge DeWeese's contention that the display constitutes private religious expression protected by the Free Speech Clause, falling beyond the bounds of Establishment Clause scrutiny. Indeed, they constitute government speech subject to the strictures of the Establishment Clause.

. Notwithstanding oft-aired criticism and debate about the Lemon test, sentiments shared and voiced in Appellant's brief, Lemon remains the law, providing the framework in Establishment Clause cases such as the instant matter and binding this intermediate federal court until such time as it is explicitly overruled or abandoned by the Supreme Court. ACLU of Ohio v. Capitol Square Review & Advisory Bd., 243 F.3d 289, 306 & n. 15 (6th Cir.2001) (en banc); Adland, 307 F.3d at 479 (6th Cir.2002) (citing Grutter v. Bollinger, 288 F.3d 732, 743 (6th Cir.2002)).

. As noted earlier in this opinion, DeWeese’s own testimony certainly suggests that he intended nothing less.